## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 13 2016, 7:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Desarai Xashia Kemp,

*Appellant-Defendant,*

*v.*

State of Indiana,

*Appellee-Plaintiff.*

September 13, 2016

Court of Appeals Case No.
49A02-1602-CR-324

Appeal from the Marion Superior Court

The Hon. Mark D. Stoner, Judge

Trial Court Cause No. 49G06-1412-F3-53975

**Bradford, Judge.**

# Case Summary

[1]     In early 2014, Appellant-Defendant Desarai Kemp befriended the pregnant Juanita Gibson, with Kemp also claiming to be pregnant.  Kemp was not, in

fact, pregnant. Over the course of several months, Kemp and Gibson became friends, with Kemp continuing to assert that she was pregnant and due a few weeks after Gibson. In early November of 2014, Gibson gave birth to her son, William.

[2] In early December of 2014, Kemp spent two nights at Gibson's, visiting with Gibson and William. At approximately 2:30 a.m. on the second night, Kemp started two fires in Gibson's apartment before kidnapping William and stealing Gibson's mother's car. Police tracked Kemp's mobile telephone to an Indianapolis dwelling, where they found Kemp hiding in a closet with William. When approached, Kemp threw William at a police officer. Ultimately, Kemp pled guilty to Level 3 felony kidnapping and Level 6 felonies auto theft and theft. The trial court sentenced Kemp to an aggregate sentence of twelve years of incarceration. Kemp argues that her sentence is inappropriately harsh. Because we disagree, we affirm.

## Facts and Procedural History

[3] Early in 2014, Kemp began communicating with Gibson; Kemp claimed to know Gibson from High School, although Gibson did not remember Kemp. Gibson was pregnant, and Kemp claimed to be pregnant as well. The women, both nineteen years old, continued to communicate via social media, text messages, and telephone calls about their pregnancies throughout 2014, and Kemp told Gibson that her due date was two weeks after hers. On November 6, 2014, Gibson gave birth to William.

[4] On December 3, 2014, Kemp, still claiming to be pregnant, went to Gibson's apartment to visit William. The visit represented the first time Gibson and Kemp met in person. Kemp appeared to be pregnant and told Gibson that she was scheduled to be induced on December 6, 2014. Kemp asked if she could spend the night, and, while the two women were out during the day, Gibson's mother saw a bottle of lighter fluid in a bag Kemp brought with her. Kemp ended up spending the following two nights at Gibson's.

[5] On the night of December 4, 2014, Gibson and Kemp were sleeping on a couch next to William's bassinet, while Gibson's mother and grandmother slept elsewhere in the apartment. At approximately 2:30 a.m. on December 5, 2014, Gibson was awakened by her grandmother, who was screaming that there was a fire in the apartment. In fact, one fire had been set in the kitchen and another underneath William's bassinet. Both fires were extinguished quickly.

[6] Kemp was not in the apartment, and Gibson realized that William was not in his bassinet. After verifying that her mother did not have William, Gibson realized that he was missing, along with his baby bag, his car seat, Gibson's mobile telephone, and her mother's car. When Gibson attempted to call her telephone, Kemp answered and, attempting to disguise her voice, said, "Did you get the car, bro[?]" Tr. p. 56. Gibson hung up and called the police, who could smell lighter fluid when they arrived at her apartment.

[7] Police traced Kemp's mobile telephone to a location in Indianapolis and found the stolen vehicle nearby. The officers observed movement and a bassinet

inside the dwelling in question. Once inside, the officers found Kemp hiding in a closet with William. When one officer approached, Kemp threw William at him. Kemp no longer appeared to be pregnant. Officers found the keys to the stolen car in Kemp's pocket and the missing car seat and baby bag in the residence.

[8] Police soon discovered that Kemp had created a Twitter account dedicated to her bogus pregnancy, on which she posted numerous photographs of herself in which she appeared to be pregnant. On December 3, the day she arrived at Gibson's home, Kemp wrote, verbatim, "It's time!!!!!" and "[t]hese contractions kicking my a** [t]hey hurt so bad. I'm dilated 6cm im finna get this epidural icant go natural I tried thou.." Ex. 2. Later, Kemp wrote, "Time to push!!!!!" and then "Him Here Born at 2:34 am Dec4th 2014 6 pounds 9oz 18in long, he was well worth them 8 hours of labor." Ex. 2. Underneath the second post, Kemp attached a picture of William. Throughout the day on December 4, 2014, Kemp continued to post pictures of William.

[9] On December 5, 2014, the Appellee-Plaintiff the State of Indiana ("the State") charged Kemp with Level 3 felony kidnapping, Level 4 felony arson, and Level 6 felonies arson, auto theft, and theft. On three dates in July of 2015, Kemp was evaluated for a psychological assessment, the report of which was issued on August 1, 2015. Kemp reported to the evaluator, *inter alia*, that she had started

taking Prozac[1] in jail, fabricated her pregnancy in order to win back a boyfriend, and used marijuana daily or multiple times a day between the ages of fifteen and eighteen. The report opined that Kemp met the diagnostic criteria for borderline personality disorder, persistent depressive disorder, and moderate cannabis use disorder. The report concluded that Kemp needed mental health treatment, including dialectical behavior therapy and continued use of psychiatric medication.

[10]     On October 26, 2015, Kemp pled guilty as charged. The record reflects that Kemp pled guilty in order to preserve her ability to challenge the requirement to register on the Sex and Violent Offender Registry, which is what would have resulted in what she believed would have been an inevitable conviction after trial. Kemp's presentence investigation report ("PSI"), filed on November 18,

---

[1] "Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), some eating disorders, and panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." U.S. National Library of Medicine, *Fluoxetine*, https://medlineplus.gov/druginfo/meds/a689006.html (last visited Aug. 30, 2016).

2015, includes Kemp's opinion that her current mental health was "good" and that she had been prescribed Zyprexa.[2] Appellant's App. p. 100.

[11] At sentencing, the trial court found Kemp's mental health to be a significant mitigating circumstance but found her guilty plea, substance abuse, and remorse to not be significantly mitigating. The trial court found Kemp's criminal history to be aggravating. The trial court, noting the "shocking behavior [and] the extreme[] amount of planning that went into the [com]mission of this crime[,]" determined that it could not find that the circumstances were unlikely to reoccur. Tr. p. 99. The trial court noted that Kemp's crimes were not impulsive and, in fact, "carefully planned at the time[,]" it appeared that Gibson had been "located and groomed over the internet[,]" and Kemp's motive was either to "trap a boyfriend" or get sympathy from her family. Tr. p. 103.

---

[2]     ZYPREXA is a prescription medicine used to treat:
- schizophrenia in people age 13 or older.
- bipolar disorder, including:
  - manic or mixed episodes that happen with bipolar I disorder in people age 13 or older.
  - manic or mixed episodes that happen with bipolar I disorder, when used with the medicine lithium or valproate, in adults.
  - long-term treatment of bipolar I disorder in adults.
- episodes of depression that happen with bipolar I disorder, when used with the medicine fluoxetine (Prozac®) in people age 10 or older.
- episodes of depression that do not get better after 2 other medicines, also called treatment resistant depression, when used with the medicine fluoxetine (Prozac), in adults.

U.S. Food and Drug Administration, *Zyprexa Medication Guide*, http://www.fda.gov/downloads/Drugs/DrugSafety/UCM134700.pdf (last visited Aug. 30, 2016).

[12] The trial court merged Kemp's arson convictions into the Level 3 felony kidnaping conviction and, on February 22, 2016, sentenced her to twelve years of incarceration for kidnapping and two years each for auto theft and theft, all sentences to be served concurrently. The trial court noted that Kemp was not eligible for direct placement in community corrections. However, the trial court stated that if it became apparent that the DOC could not provide dialectical behavior therapy, it would modify her sentence to a placement in community corrections in a work-release facility. To that end, the trial court requested that Kemp's trial counsel file a sentence modification request in March of 2017. Kemp indicated that she was still receiving medication in jail, and the trial court stated that "she appears to be in pretty good shape right now." Tr. p. 119.

# Discussion and Decision

[13] Kemp argues that her twelve-year executed sentence is inappropriately harsh, suggesting that an appropriate sentence is three years executed with nine suspended to probation. Under our current sentencing scheme, "the trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2008). We review the sentence for an abuse of discretion. *Id*. An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances." *Id*. As mentioned, the trial court sentenced Kemp to an aggregate sentence of twelve years of incarceration following her convictions and concurrent sentences for Level 3 felony kidnapping and Level 6 felonies

auto theft and theft. "A person who commits a Level 3 felony … shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, with the advisory sentence being nine (9) years." Ind. Code § 35-50-2-5.

[14] The nature of Kemp's offenses and her horrendous conduct easily justify her enhanced twelve-year sentence. Over the course of several months, Kemp formulated her elaborate scheme to kidnap Gibson's newborn child and claim him as her own. Kemp spent several months gaining the trust of Gibson, who was likely chosen as a victim for no other reason than that she happened to be pregnant and due around the time Kemp claimed to be due. As for the execution of the final stages of Kemp's plan, her use of arson (whatever her intent) as an alleged diversion could have had very tragic consequences, as there were three persons asleep in Gibson's apartment at the time and unknown others in the rest of the building. It should also be remembered that when found by police, Kemp *threw* one-month-old William at them. In summary, because Kemp's offenses were crimes that could have easily resulted in death and/or serious injury, their nature justifies her enhanced twelve-year sentence.

[15] Kemp's character also justifies her enhanced sentence. The elaborate planning, the months-long deception, and the exploitation of Gibson's trust all reflect negatively on Kemp's character. Kemp, who was nineteen at the time of the instant offenses, also has a somewhat extensive criminal history. Kemp had five experiences with the juvenile justice system, resulting in adjudications for battery resulting in bodily injury (twice, apparently) and leaving home without permission of a parent or guardian. At the time of sentencing in this case,

Kemp had charges pending for Level 6 felonies resisting law enforcement using a vehicle and auto theft and Class A misdemeanor resisting law enforcement.

[16] The heart of Kemp's argument is essentially that there is no way that Kemp can receive the treatment she needs for her mental health issues while incarcerated in DOC. First, the deliberation and planning exhibited by Kemp in the execution of her kidnapping scheme undercut any suggestion that she was incapacitated to any great degree by her mental health issues. Kemp seems to have known what she was doing and had several months to abandon her scheme, but did not. Second, there is some indication that the treatment Kemp is already receiving is effective. The record indicates that Kemp has begun taking Prozac and/or Zyprexa and subsequently self-reported her mental health as "good." Appellant's App. p. 100. At her sentencing, Kemp indicated that she was still receiving her medication in jail, and the trial court noted that "she appears to be in pretty good shape right now." Tr. p. 119. Moreover, the record indicates that any medications usually get sent along with a prisoner to DOC, so there is no reason to believe that Kemp's apparently effective treatments will cease.

[17] Finally, we cannot ignore the trial court's clearly-stated intent to modify Kemp's placement to community corrections upon her filing a modification request in March of 2017 if DOC cannot provide her with the dialectical behavior therapy recommended in her psychological assessment report. So, even assuming that Kemp is in need of treatment beyond her current medication, she will either receive it from DOC or she will almost certainly

have her placement modified in March of 2017. Although Kemp is correct that her sentence currently stands as twelve years of incarceration, the trial court has clearly indicated its intent to modify that placement if it deems it necessary. Any claim that Kemp will spend twelve years in DOC without needed mental health treatment is speculative at this point. Kemp has failed to establish that her twelve-year executed sentence is inappropriately harsh in light of the nature of her offenses and her character, as well as the circumstances of this case.

[18] We affirm the judgment of the trial court.

Pyle, J., and Altice, J., concur.